# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| APRIL GOODSON, | : | |
| Plaintiff, | : | Case No. 3:10cv00432 |
| vs. | : | District Judge Walter Herbert Rice |
| MICHAEL J. ASTRUE,<br>Commissioner of the Social<br>Security Administration, | :<br><br>: | Magistrate Judge Sharon L. Ovington |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.  INTRODUCTION

Plaintiff April Goodson sought financial assistance from the Social Security Administration by applying for Supplemental Security Income ("SSI") on December 11, 2006, claiming disability from August 15, 2004, due to "carpal tunnel, can't sleep, and muscle spasms." (*Page ID##* 137-39, 154). Her application was denied during the initial administrative proceedings. She was then provided a hearing before Administrative Law Judge ("ALJ") Amelia G. Lombardo. On March 5, 2010, the ALJ issued a decision concluding that Plaintiff was not under a "disability" within the meaning of the Social Security Act and was therefore not eligible for SSI. (*Page ID##* 53-68). The ALJ's

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

decision and the resulting denial of benefits became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff is now due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. # 11), the administrative record (Doc. # 6), and the record as a whole.

Plaintiff seeks an Order reversing the ALJ's decision and granting her benefits. At a minimum, Plaintiff seeks a remand of this case to the Social Security Administration to correct certain errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II. BACKGROUND

### A. **Plaintiff and her testimony**

Plaintiff was 48 years old on the date she filed her application, and 51 years old at the time of the administrative decision. Thus, Plaintiff is considered to be "closely approaching advanced age" for purposes of resolving her SSI claim. *See* 20 C.F.R. § 416.963(d); *see also Page ID#* 137. She has a high school education[2], *see* 20 C.F.R. § 416.964(b)(4); *see also Page ID##* 146, 159, and past relevant work as an assembler and welder in a car parts manufacturing factory. (*Page ID#* 155).

---

[2]In high school, Plaintiff was designated as a "Special Education Student (EMR)." (*Page ID#* 146).

Plaintiff testified at the administrative hearing³ that she has difficulty sleeping. (*Page ID#* 80). She cries every now and then. *Id.* She testified that she just wants to sleep during the day. *Id.* "I don't want to get up and do nothing." *Id.* She was not taking any medications or attending counseling for her depressive symptoms. *Id.* She has never told her treating physician at the Cassano Health Clinic, Dr. Hardy, about her depression. (*Page ID#* 85). Plaintiff also testified that when she went to Crisis Care they recommended that she go to Daymont, but she was unable to follow up with the treatment recommendation to attend Daymont because she lacked transportation. (*Page ID#* 81). Plaintiff testified that she stopped using cocaine in March 2008. (*Page ID#* 80-81).

As to her daily activities, Plaintiff reported she "might try to wash a few dishes" or cook as long as she does not have to stand too long. (*Page ID#* 81). She does very little grocery shopping, maybe once a week. *Id.* A friend typically takes her. *Id.* Most of the day she simply lies around in bed and watches television. (*Page ID#* 82). She stays in bed because she is bored, depressed, and has pain. (*Page ID#* 83).

B.    **Vocational Expert Testimony**

The vocational expert ("VE") described Plaintiff's past employment as a parts picker, an unskilled job requiring medium exertion. (*Page ID#* 87). The VE was asked to assume a claimant with Plaintiff's vocational profile with the residual functional capacity for light exertion who would be limited to lifting 10 pounds, low stress work,

---

³Because the alleged errors raised by Plaintiff do not implicate Plaintiff's alleged exertional impairments, the Court has not summarized that portion of her testimony.

which would be no assembly line production quotas or fast paced work. In response, the VE testified that such a hypothetical individual could perform about 10,000 light jobs that are available in the national economy. (*Page ID## 87-88*). If the hypothetical person was further limited to only having minimal contact with the general public, the number of available jobs would decrease to 5,000. (*Page ID# 88*).

### C. Educational Record

The record contains Plaintiff's transcript from Jefferson Township High School. (*Page ID# 146*). Plaintiff received credit for 25 of the 26 classes she took, and graduated on June 5, 1977. *Id.* The only class Plaintiff failed was Driver's Education, but she took it a second time and earned a B. *Id.* Plaintiff's high school transcript indicates she received 5 A's, 10 B's, 8 C's, 2 D's, and 1 F[4]. *Id.* Plaintiff's transcript designates her as a "Special Education Student (EMR)," but there is no indication as to which of the courses Plaintiff completed were deemed "special education," the overall level of her curriculum, or what type of accommodations were made for Plaintiff while in school. *Id.*

### D. Medical Record and Opinions

Clinical Psychologist, Nicole Leisgang, Psy.D., examined Plaintiff at the request of the Ohio Bureau of Disability Determination in February 2007. (*Page ID# 206-11*). Plaintiff reported, "I'm depressed . . . I want to lay down all the time . . . I don't want to do nothing." (*Page ID# 206*). She alluded to withdrawal and occasional crying episodes.

---

[4] Plaintiff's transcript indicates the following regarding grades: "A = 94-100; B = 86-93; C = 77-85; D = 70-76; and, F = Below 70." (*Page ID# 146*).

She described herself as continually depressed and occasionally anxious. She alluded to a long history of crack cocaine abuse. *Id.* She also reported increased tolerance and previous attempts to stop abusing the substance. She stated that she has not used crack cocaine in the past six months. Plaintiff also reported that she was a special education student who had difficulties with reading, writing, and math. *Id.* She lived with her daughter and grandson. *Id.* She had limited contact with one friend. (*Page ID#* 210). Her daily activities included watching television, household chores, and crocheting. (*Page ID#* 207).

Plaintiff had been incarcerated for four months and released in November 2006. As an adult, she had been arrested for solicitation, probation violation, and drug possession. (*Page ID#* 207). Plaintiff acknowledged that she never sought any mental health treatment and was not on any medication for depression. (*Page ID##* 206, 208).

Dr. Leisgang noted that Plaintiff was cooperative, with adequate rapport, clean and neat in appearance, and had no eccentricities except some anxiety and depression. (*Page ID#* 207). She maintained adequate eye contact, spoke and moved at an adequate rate of speed, and appeared to have sufficient energy. (*Page ID#* 208). Dr. Leisgang also noted that Plaintiff did not appear to exaggerate or minimize her difficulties. (*Page ID##* 207-08). Dr. Leisgang observed that Plaintiff's phraseology, grammatical structure, and vocabulary suggested that she was intellectually limited. (*Page ID#* 208).

The Wechsler Adult Intelligence Scale-Third edition (WAIS-III), was administered which resulted in a verbal IQ score of 66, a performance scale IQ score of

68, and a full scale IQ of 64, "indicating that she is currently functioning in the mild retarded range of intelligence or at about the first percentile for her age group." (*Page ID#* 209). Dr. Leisgang opined the scores were "lower than would be expected given her clinical presentation. Emotional factors very likely interfered with her performance on this measure, as she appeared to be of borderline intelligence." *Id.* She also reported that Plaintiff's "judgment appears to be sufficient for her to make decisions affecting her future and to conduct her own living arrangements efficiently." *Id.* Dr. Leisgang diagnosed recurrent Major Depressive Disorder; Cocaine Dependence, in early partial remission; and Borderline Intellectual Functioning. (*Page ID#* 210). Dr. Leisgang assigned a current Global Assessment of Functioning ("GAF") score of 49.[5]

Dr. Leisgang concluded that Plaintiff's ability to relate to others, including fellow workers and supervisors was moderately impaired by her emotional difficulties. "She very likely may have difficulty relating adequately to others and completing simple repetitive tasks." (*Page ID#* 211). Dr. Leisgang opined that Plaintiff's ability to understand, remember, and follow simple instructions was moderately impaired by her emotional difficulties and limited intellect. Dr. Leisgang also reported that Plaintiff's pace might be slowed by her depressive symptomatology. Dr. Leisgang further opined

---

[5]Health care clinicians perform a Global Assessment of Functioning to determine a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Hash v. Comm'r of Social Security*, 309 Fed.Appx. 981, 988 n.1 (6th Cir. 2009); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34. Individuals with scores of 41-50 are classified as having "serious symptoms ... or serious impairment in occupational, social, or school functioning." *Id.* at 34.

that Plaintiff's mental ability to maintain attention, concentration, persistence, and pace was moderately impaired by her emotional difficulties and limited intellect. "Her attention and concentration skills were not strong during this evaluation and may deteriorate over extended time periods, slowing her performance in completing simple repetitive tasks." *Id.* Dr. Leisgang opined that Plaintiff's ability to withstand the stress and pressures associated with day-to-day work activities was moderately to seriously impaired by her emotional difficulties. "Such stress may result in increased anxiety and decreased attention and concentration skills. It may lead to such increased depressive symptomatology such as crying, withdrawal, and slowed work performance. Finally, it could result in return to substance abuse." *Id.* Dr. Leisgang concluded that if Plaintiff was granted benefits she might have difficulty managing funds prudently "given her relatively recent sobriety and limited arithmetic reasoning skills." *Id.*

On February 27, 2007, psychologist, Kevin Edwards, Ph.D., reviewed the record on behalf of the Ohio BDD. (*Page ID##* 218-35). Dr. Edwards opined that Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (*Page ID#* 228). Dr. Edwards reported that Plaintiff could "attend to, recall, and complete SRT [simple, repetitive tasks] in a stable work environment." (*Page ID#* 234). He also wrote that she "would recall and perform better with verbal or hands-on instruction (versus written), and superficial public contact." *Id.* In July 2007, Dr.

7

Caroline Lewin reviewed the record and affirmed Dr. Edwards' assessment. (*Page ID#* 239).

Plaintiff sought treatment at Crisis Care for intervention following a relapse on crack cocaine and marijuana. (*Page ID##* 275-85). In March 2007, Plaintiff returned to jail for six months due to drug trafficking, solicitation, and possession. (*Page ID##* 278, 280). She was released in November 2007, and stayed clean for 2 months. (*Page ID#* 280). In January 2008, she started smoking crack once or twice weekly, and marijuana less frequently. (*Page ID##* 275, 278, 280). In March 2008 she was using crack cocaine about once a week, and marijuana less than once a week. (*Page ID#* 278). She also noted she had a depressed mood and would sleep all day if she could. (*Page ID#* 279). Crisis Care identified that Plaintiff needed employment, wrote "obtain employment" as one of her goals, and referred her to a job center. (*Page ID##* 280-81). Mental status examination revealed that Plaintiff had average eye contact, clear speech, logical thought, euthymic mood, full affect, and was judged to be of average intelligence. (*Page ID#* 283). Plaintiff was diagnosed with a depressive disorder, not otherwise specified along with cocaine dependence and cannabis abuse. She was assigned a GAF of 52. (*Page ID#* 281). She was referred to drug treatment. (*Page ID##* 284-85).

III. **THE "DISABILITY" REQUIREMENT AND ADMINISTRATIVE REVIEW**

    A.    <u>**Applicable Standards**</u>

The Social Security Administration provides SSI to indigent individuals, subject to several eligibility requirements. Chief among these, for purposes of this case, is the

"disability" requirement. To receive SSI, an applicant must be a "disabled individual." 42 U.S.C. § 1381a; *see Bowen v. City of New York*, 476 U.S. 467, 470 (1986). The phrase "disabled individual" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. 42 U.S.C. § 1382c(a)(3)(A); *see Bowen*, 476 U.S. at 469-70. An SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992).

   B.   **Social Security Regulations**

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See Page ID##* 53-55; *see also* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

9

> 5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

### C.    ALJ Lombardo's Decision

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff has not engaged in substantial gainful activity since August 15, 2004, the alleged onset date. (*Page ID#* 56).

The ALJ found at Step 2 that Plaintiff has the severe impairments of cervical degenerative disc disease; depression; borderline intellectual functioning; and substance abuse. *Id.* The ALJ determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that meet or equal the level of severity described in Appendix 1, Subpart P, Regulations No. 4. (*Page ID#* 57).

At Step 4 the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform light work, but was limited to unskilled work with occasional overhead reaching bilaterally. (*Page ID#* 60). The ALJ further determined that allegations of disability are not supported by substantial objective medical evidence or clinical findings. (*Page ID#* 66).

The ALJ next found that considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform. (*Page ID##* 67-68). This assessment, along with the ALJ's findings

throughout her sequential evaluation, led her to ultimately conclude that Plaintiff was not under a disability, and hence not eligible for SSI. (*Page ID#* 68).

## IV. JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Social Security*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Social Security*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "(E)ven if supported by substantial

11

evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V. DISCUSSION

### A. Plaintiff's contentions

Plaintiff argues that she meets or equals Listing § 12.05C - which contains the criteria for mental retardation. (Doc. # 8 at 12). According to Plaintiff, the ALJ erred in finding Plaintiff's IQ scores invalid. *Id.* Further, Plaintiff contends that the ALJ's finding concerning her RFC is not supported by substantial evidence. *Id.* at 15. Finally, Plaintiff argues that the ALJ erred in her evaluation of medical source opinion concerning Plaintiff's ability to function mentally in the work place. *Id.* at 17.

### B. Listing § 12.05C

The Regulations explain the criteria for mental retardation in § 12.05 of the Listings:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D).
>
> If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing. Paragraphs A and B contain criteria that describe disorders we consider severe enough to prevent your doing any

gainful activity without any additional assessment of functional limitations. For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work. Paragraph D contains the same functional criteria that are required under paragraph B of the other mental disorders listings.

12.05 *Mental retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
. . .
C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

The regulations provide that a claimant will meet the listing for mental retardation only "[i]f [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph and one of the four sets of criteria...." *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) (citations omitted).

**C.** **Analysis**

The ALJ noted that the "[e]xamining psychologist Dr. Leisgang found that the claimant has a verbal IQ of 66, a performance IQ of 68, and a full-scale IQ of 64," but nonetheless determined the IQ scores to be "invalid," and the requirements in paragraph

13

C of Listing § 12.05 not to have been met. (*Page ID* ## 59-60). In reaching this conclusion, the ALJ relied on the fact that Dr. Leisgang not only "diagnosed borderline intelligence and not mental retardation," but noted "the claimant's IQ scores were lower than she expected given the claimant's clinical presentation." (*Page ID*## 59). The ALJ also considered that Plaintiff raised children, lives independently with cousins, took the written test to obtain her driver's license, goes to the grocery (inferring she can handle money correctly), and can "understand and recognize the proper parts required for assembly as, in her past work, she delivered parts to various areas of the factory."[6] (*Page ID#* 59). These facts, however, are insufficient to support the ALJ's conclusion that Plaintiff's IQ test scores are invalid.

In *Brown v. Secretary of Health & Human Services*, the United States Court of Appeals for the Sixth Circuit determined the plaintiff, Mr. Brown's, IQ score of 68 to be valid and his abilities to be within the DSM-III-R's [7] diagnosis of mild mental retardation corresponding to an IQ between 50-55 and 70. The Court of Appeals explained:

> Mr. Brown is able to use public transit; he has a driver's license; he visits friends; he is able to make change at the grocery store; he can do his own laundry and clean his room; he has completed the sixth grade; he has a limited level of reading comprehension (Mr. Brown stated that he can follow a road atlas, and a friend testified she had seen him reading a newspaper); and as a truck driver, Mr. Brown recorded mileage, the hours he worked, and the places he drove.

---

[6] The VE testified Plaintiff's past relevant work was as a "parts picker," performed at the medium, unskilled level. (*Page ID#* 87).

[7] Diagnostic and Statistical Manual of Mental Disorders, 3rd ed., Revised

*Brown v. Secretary of Health & Human Services*, 948 F.2d 268, 269-70 (6th Cir. 1991). The abilities of individuals with mild mental retardation, as defined by DSM-III-R, and noted by the Court of Appeals in *Brown*, are similar to the abilities possessed by Plaintiff in this case. The Court of Appeals explained that individuals with mild mental retardation

> [b]y their late teens . . . can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need guidance and assistance when under unusual social or economic stress. At the present time, virtually all people with Mild Mental Retardation can live successfully in the community, independently or in supervised apartments or group homes (unless there is an associated disorder that makes this impossible).

*Brown*, 948 F.2d at 270 (quoting DSM-III-R § 317.00).

Like Mr. Brown, Plaintiff's abilities are not inconsistent with a finding of mild mental retardation, *see id.*, nor has the ALJ cited, or the Commissioner offered, any empirical evidence to the contrary.

Although Dr. Leisgang stated she believed Plaintiff's "tested IQ is slightly lower than would be expected given her clinical presentation," she attributed this to "emotional factors." (*Page ID#* 209). Dr. Leisgang made no indication, however, that the results were not valid. In fact, Dr. Leisgang indicated "[t]he scatter in [Plaintiff's] subtest scores falls within acceptable limits," and "the discrepancy between her Verbal and Performance IQ is small." (*Page ID#* 209). Even assuming Dr. Leisgang's "slightly lower" observation is fully accepted, it does not invalidate Plaintiff's within-range IQ scores. Assuming Plaintiff did perform "slightly" lower than expected, it is not unreasonable to

conclude that scores from another IQ test, even if "slightly" higher, would still be in the range of 60-70, as required to meet the criteria of paragraph C in Listing § 12.05. As in *Brown*, however, a second IQ test was not administered to Plaintiff. *See Brown*, 948 F.2d at 270 ("We also note that the Secretary could have administered a second IQ test were he certain of the invalidity of Mr. Brown's scores. He did not."). Likewise, there was no evidence of bad faith or malingering by the Plaintiff that may be used to invalidate the IQ test scores. *See Shepherd v. Sullivan*, 889 F.2d 1088, *3 (6th Cir. 1989).

It is important to note, however, that it was not improper for the ALJ to question the validity of scores from an IQ test. In fact, the regulations provide that "since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." 20 C.F.R. § 404, Subpt. P, App. 1 § 12.00D(6)(a). The ALJ erred, however, because her determination that the IQ test scores were invalid was not supported by substantial evidence. Again, the abilities of the Plaintiff referenced by the ALJ were not inconsistent with mild mental retardation, no other IQ tests were performed, and the record lacks evidence from any medical source finding the scores invalid. The lack of a diagnosis of mental retardation similarly does not invalidate the IQ test scores, nor is such a diagnosis required in order to meet or equal Listing § 12.05C's criteria.

For all of the above reasons, Plaintiff's Statement of Errors is well taken.[8]

## VI. REMAND IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of Health & Human Services*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of a disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. Although the evidence shows that Plaintiff has a valid full scale IQ score of 64, more is required to meet or equal Listing § 12.05C's criteria. *See Foster*, 279 F.3d at 354 ("[A] claimant will meet the listing for mental retardation only 'if [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph **and** any one of the four sets of criteria . . . .'") (internal citations omitted) (emphasis in original). Evidence indicating

---

[8] Because of this conclusion and the resulting need to remand this case, an in-depth analysis of Plaintiff's remaining challenge to the ALJ's decision is unwarranted.

Plaintiff satisfies the diagnostic description in Listing § 12.05C is not overwhelming, nor strong while contrary evidence is weak.

To satisfy the diagnostic description in the introductory paragraph of Listing § 12.05C, substantial evidence must demonstrate or support a finding that the claimant has "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, . . . before age 22." 20 C.F.R. § 404, Subpt. P, App. 1 § 1205. Because the ALJ found Plaintiff's IQ test scores invalid, and thus Listing 12.05C's criteria unmet, her Step-3 analysis stopped there. The ALJ did not determine whether evidence provided by Plaintiff was sufficient to satisfy the diagnostic description in the introductory paragraph of Listing § 12.05. Accordingly, on remand, at Step 3 of the newly performed five-Step sequential analysis, the ALJ must determine whether the evidence provided by Plaintiff demonstrates or supports a finding that the claimant has "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, *i.e.*, . . . before age 22." *Id.*

It should also be noted that the ALJ incorrectly found "there is no evidence that the claimant went through special education classes." (*Page ID#* 60). While questions may exist as to the actual level of curriculum Plaintiff completed in high school, she has produced some documentation - her high school transcript (*Page ID#* 146) - consistent with her statement to Dr. Leisgang that she was a special education student. (*Page ID#* 206). Thus, while this Court is not addressing whether her high school transcript, without

18

more, is sufficient evidence to resolve whether she had "deficits in adaptive function initially manifested during the developmental period," it was nonetheless incorrect for the ALJ to conclude that *no* evidence of special education classes existed in the record. On remand this evidence must be considered.

Due to the problems discussed above, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of § 405(g). On remand the ALJ should be directed to evaluate Plaintiff's disability claim under the required five-Step sequential analysis to determine anew whether Plaintiff was under a disability and whether her application for SSI should be granted.

**IT IS THEREFORE RECOMMENDED THAT:**

1. The ALJ's decision be vacated;

2. No finding be made regarding whether Plaintiff is under a "disability" within the meaning of the Social Security Act;

3. This matter be **REMANDED** to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and,

4. The case be terminated on the docket of this Court.


January 24, 2012                             s/Sharon L. Ovington
                                              Sharon L. Ovington
                                          United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).